[Crim. No. 7033. Second Dist., Div. Three. July 29, 1960.]

THE PEOPLE, Respondent, v. ARTHUR LEE HURST, Appellant.

Thomas H. Ludlow, Jr., under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

VALLÉE, J.—In count I of an information defendants Arthur Lee Hurst and Anniece Jones were accused of unlawfully having heroin in their possession on May 18, 1959. In count II they were accused of unlawfully having marijuana in their possession on the same date. The court, sitting without a jury, found them guilty on both counts. Arthur Lee Hurst was sentenced to state prison. He appeals from the judgment and order denying a new trial. He will be referred to as the defendant. Anniece Jones did not appeal.

About 3:30 p.m. on May 18, 1959, Officer Garrahan of the Los Angeles Police Department received an anonymous telephone call at the narcotics division office in the Police Building. The person on the telephone said, "If you want to find two pounds of marijuana look under the house at 309 West 83d Street," and hung up. Garrahan testified the voice sounded like that of a female and he had not heard it before.

Garrahan related the content of the call to Officers Hanks and Grennan, and the three officers drove to the address given by the caller, 309 West 83d Street, arriving there about 4 p.m. The building at that address was a single-story duplex. There were two residences, numbered 307 and 309.

After parking in front of the duplex the officers went directly to the residence at 309. Garrahan went to the front door; Hanks, to the rear of the building; and Grennan, to the side. As Garrahan approached the building, he saw a female Negro through an open window inside the house. On reaching the front door he knocked once, waited a few moments and knocked a second time, waited "a period of time" and knocked a third time. Anniece Jones came to the door. Garrahan identified himself as a police officer. Anniece opened the door and he walked in. Anniece did not tell him he could enter. He did not force his way into the house. Anniece did not say anything until he was inside. In the house, Garrahan told Anniece the officers had information there was marijuana at the house and asked her if she would mind their looking around. Anniece said, "My husband is not here. He will be home in about thirty minutes."

Garrahan testified that immediately after Anniece made this statement Hanks came to a window and "yelled" that "The stuff is under the house. Place them under arrest." Garrahan then placed Anniece under arrest.

In the meantime, Grennan, at the side of the building, was looking through a screened window into the bathroom. He heard Garrahan knocking on the front door and in "a matter

of moments" after he heard the knocking, he saw Anniece enter the bathroom and empty something from an ashtray into the toilet and flush it. He did not see what she flushed down the toilet. He immediately "stated in a loud voice" that Anniece had flushed something down the toilet, walked around to the front of the house and went in. As he entered he heard Hanks calling in the rear window that the stuff was under the house, place them under arrest. He then heard Garrahan tell Anniece she was under arrest. He did not see what Hanks did at the rear of the house. He did not recover anything from the toilet.

When Hanks reached the rear of the house he noticed that the screen was off a vent hole underneath the bedroom window of 309. The screen was alongside the vent hole. The vent hole was about 12 to 14 inches long and about 8 inches wide. About six inches inside the hole he saw a large brown package. He could "readily" see it standing outside. He reached under the house and got the package. The package was about a foot and a half long and 6 to 8 inches in diameter. There were two brown paper bags covering two plastic bags which, in turn, covered a large gray pillowcase. He felt of the pillowcase and felt "a weedy, leafy material" inside one of the bags. He immediately knocked on the rear window and told Garrahan "the stuff is under the house, place them under arrest." In the second bag there were two "condoms" containing a white powder, wrapped in a handkerchief. In the package there was also what looked like a "hypodermic outfit." He then entered the house and searched it. In a purse which was sitting on a dresser in the bedroom he found a bag which contained numerous green seeds, three packages of cigarette papers, and a gas bill made out to defendant at 309 West 83d Street. He found another purse which Anniece said was hers which contained two green seeds lying loose on the bottom. He also found two hypodermic needles and an eye dropper wrapped in a piece of paper in a "poker chip box."

Defendant Arthur Hurst arrived at the house in a Ford about 4:45 p.m. As he walked toward the front door Grennan and Hanks stepped out, identified themselves, and asked him who he was. Defendant said he was Arthur Hurst. He was immediately placed under arrest. Hanks searched the car and under the dashboard on the driver's side found one brown paper cigarette.

Officer Grennan had a conversation with defendant in the house in which defendant stated he did not know anything

about any marijuana being in the house or underneath it; he knew the two needles had been in the house; they belonged to a couple of friends of his up north; he had been "to the joint twice, once for marijuana and once for heroin"; he knew what it was all about but none of the "stuff" they found belonged to him; he did not know anything about the cigarette found in the car, he did not "know how it could have got there."

The package found under the house contained 20 grams of heroin, four pounds of marijuana, and a hypodermic outfit. The seeds found in the purses were marijuana. The cigarettes found in the house and in the car contained marijuana. The items mentioned were all admitted in evidence. Defendant made appropriate and timely objections to their admission. The objections were overruled.

The officers had neither a search warrant nor a warrant for defendant's arrest.

The first point made for reversal is that the police, in searching defendant's home and automobile and in arresting him, did so without probable cause in violation of Article I, section 19, of the Constitution of California which provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated." A peace officer may, without a warrant, arrest a person whenever he has reasonable cause to believe that the person to be arrested has committed a felony. (Pen. Code, § 836, subd. 3.) ▮ Reasonable cause is a suspicion founded on circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true. (*People* v. *Brite,* 9 Cal.2d 666, 687 [72 P.2d 122] ; *People* v. *McMurray,* 171 Cal.App.2d 178, 184 [340 P.2d 335].) ▮ The defendant makes a prima facie case that the arrest or search was made without reasonable cause when he establishes that the arrest without a warrant or search without a warrant was made, and the burden then rests on the prosecution to show proper justification. (*People* v. *Silvestri,* 150 Cal.App.2d 114, 118 [309 P.2d 871].) ▮ It is apparent that the officers embarked on the trip to defendant's home without reasonable cause to believe a felony had been committed or that defendant had committed a felony. All they had was a telephone call from an unknown party. Information from an unknown party alone is not a sufficient basis for a lawful search. (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36].)

▮ Where the only information received by the police is

from an anonymous informer, evidence must be introduced that would justify the conclusion that reliance on the information was reasonable. Such evidence may be supplied by the personal observations of the police. (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294-295 [294 P.2d 36]; *People* v. *Prewitt,* 52 Cal.2d 330, 337 [341 P.2d 1].) ■■■ If, before the search and seizure, Officer Garrahan was justified in making an arrest, it is immaterial that the search and seizure preceded the arrest. (*People* v. *Simon,* 45 Cal.2d 645, 648-649 [290 P.2d 531].)

The question is: Were the observations of the officers at defendant's home sufficient to establish reasonable cause for the search? ■■■ In determining whether an arresting officer had reasonable cause to believe a person had committed a felony and therefore was justified in placing him under arrest, the court looks only at the facts and circumstances presented to the officer at the time he was required to act. (*People* v. *Cantley,* 163 Cal.App.2d 762, 765 [329 P.2d 993].) ■■■ As Garrahan approached the house he saw a female through an open window. Garrahan knocked on the front door. No one answered. He waited "a short period of time" and knocked again. No one answered. He knocked a third time, and Anniece Jones opened the door. While Garrahan was knocking on the door, Grennan saw Anniece enter the bathroom, empty something from an ashtray into the toilet, and flush it. Grennan did not see what she flushed down the toilet.

It is doubtful whether the mere fact that Anniece was seen emptying an ashtray into the toilet and flushing the toilet alone would constitute reasonable cause for entering the house. In addition, however, it may be inferred from the fact that Garrahan saw Anniece through an open window as the officers approached the house that Anniece saw them approaching. She did not open the door until Garrahan had knocked three times, with waiting periods between knocks; and while Garrahan was waiting at the door she emptied the ashtray into the toilet and flushed it, a familiar method of disposing of contraband. (*People* v. *Merino,* 151 Cal.App.2d 594, 597 [312 P.2d 48].) Preceding the arrest, Hanks, standing outside the house, saw through the vent hole a large brown package under the house. On seeing the package he knocked on the rear window and called to Garrahan that the "stuff" was under the house, "Place them under arrest." When Garrahan heard this, he placed Anniece under arrest. Hanks immediately entered the

house and conducted the search. The observations of the officers were sufficient to justify Garrahan's reliance on the information given by the unidentified informer. The circumstances were such that they had reasonable cause, before the arrest and search, to believe that the occupant of the house was guilty of unlawfully possessing narcotics. The search and seizure were lawful, and the arrest was valid. (*Cf. People* v. *Blodgett,* 46 Cal.2d 114 [293 P.2d 57] ; *People* v. *Sanson,* 156 Cal.App.2d 250 [319 P.2d 422] ; *People* v. *Zubia,* 166 Cal.App. 2d 620 [333 P.2d 349].)

Defendant asserts that the reasonableness of the officers' actions must be judged solely on what they knew when they stepped into the curtilage.[1] The point is without merit. ▊ Mere presence on the land of another does not bar reliance and action on what is seen from such a vantage point. (*People* v. *Wright,* 153 Cal.App.2d 35, 38 [313 P.2d 868]. Also see *People* v. *Moore,* 140 Cal.App.2d 870, 871 [295 P.2d 969] ; *People* v. *Easley,* 148 Cal.App.2d 565, 567-568 [307 P.2d 10] ; *People* v. *Amado,* 167 Cal.App.2d 345, 347 [334 P.2d 254].) ▊ A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way ; the mere looking at that which is open to view is not a search. (*People* v. *Spicer,* 163 Cal.App.2d 678, 683 [329 P.2d 917].) ▊ Neither looking through the vent nor looking through the window constituted an unreasonable search. (*People* v. *Martin,* 45 Cal.2d 755, 762 [290 P.2d 855].)

▊ It is next contended there was no proof of the corpus delicti. The argument is that no proof was adduced to show that the material seized by the officers was in fact narcotics. At the preliminary hearing the report of a forensic chemist was received in evidence by stipulation. In entering into the stipulation, defendant's counsel on two occasions expressly limited it ''for the purpose of the preliminary only.'' At the trial it was stipulated that the People's case in chief be submitted on the transcript of the preliminary hearing and that any stipulations entered into there be deemed entered into for the purposes of the trial. Thus it appears the point is untenable. The effect of the stipulation at the trial was that the stipulation made at the preliminary hearing to the effect that the report of the forensic chemist which showed that the material seized was narcotics applied to the trial. The stipulation

---

[1]The curtilage is the area of land adjoining a dwelling house, used in connection therewith in the conduct of family affairs and for carrying on domestic purposes. (25 C.J.S. 65.)

at the trial incorporated the prior stipulation at the preliminary hearing. The corpus delicti was proved.

Finally, it is contended the People failed to show that defendant had the requisite degree of possession of the narcotics necessary to sustain a conviction under section 11500 of the Health and Safety Code. On a charge of possessing a narcotic in violation of section 11500, the People must prove that the defendant had actual or constructive possession of a narcotic and that he was aware it was a narcotic. (*People* v. *White,* 50 Cal.2d 428, 431 [325 P.2d 985].) These elements may be established by circumstantial evidence and reasonable inferences drawn therefrom. (*People* v. *Magdaleno,* 158 Cal.App.2d 48, 51 [322 P.2d 89].) The narcotics need not be found on the person of the defendant; it is sufficient if they are deposited in a place under the possession and control of the accused. Exclusive possession of the premises is not necessary nor is physical possession of the drug of the essence. (*People* v. *Robarge,* 151 Cal.App.2d 660, 668 [312 P.2d 70].) Evidence of physical possession by the defendant's agent or by any other person when the defendant has an immediate right to exercise dominion and control over the narcotic has been held sufficient to sustain a conviction under section 11500 of the Health and Safety Code. (*People* v. *MacArthur,* 126 Cal.App.2d 232, 236-237 [271 P.2d 914].) Defendant and Anniece, unmarried, had lived together at 309 West 83d Street about eight months. The house was defendant's home. It and the space beneath it were under his dominion and control. Defendant was not a stranger to narcotics. He admitted having been to the ''joint'' for possession of narcotics. A large quantity of heroin and marijuana was found under the house within sight and easy reach. Marijuana and hypodermic needles were found in the house. Defendant admitted knowing the hypodermic needles were in the poker chip box. A marijuana cigarette was found in his car under the dashboard on the driver's side. The actual finding of the marijuana cigarette in the automobile is sufficient to warrant an inference of knowledge thereof on his part. (*People* v. *Dewson,* 150 Cal.App.2d 119, 132-133 [310 P.2d 162] ; *People* v. *Anders,* 167 Cal.App.2d 65, 68 [333 P.2d 854].) The evidence warrants a reasonable inference that the narcotics found under the house, in the house, and in the car were in defendant's possession and their character known to him.

The judgment and order denying a new trial are affirmed.

Shinn, P. J., and Ford, J., concurred.